THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

EVOX PRODUCTIONS LLC,

        Plaintiff,

        v.

CHROME DATA SOLUTIONS, LP,
et al.,

        Defendants.

No. 3:16-cv-0057-PK

**FINDINGS AND
RECOMMENDATION**

**PAPAK, J.**

Plaintiff Evox Productions LLC (EVOX) brings this action against Defendant Chrome

Data Solutions, LP, and Doe Defendants (collectively Chrome), asserting claims for contributory

or vicarious copyright infringement, breach of contract, contractual indemnity, and accounting.[1]

Compl., ECF No. 1.  Chrome brings counterclaims against EVOX for unjust enrichment and

breach of contract.  Answer and Countercls., ECF No. 48.

---

[1] EVOX's claim for declaratory relief on its contractual obligation to participate with Chrome in alternative dispute resolution is now moot.  *See* Def.'s Reply 1 n.1, ECF No. 86.  In November 2016, this court stayed this action until January 2017 while the parties unsuccessfully pursued mediation.  *See* Order, ECF No. 41.

EVOX creates and licenses photographic and computer-generated digital images of almost all automobile makes and models sold in the United States since model year 2000. EVOX alleges that its images "are widely used by its customers on websites and in mobile applications whose purpose is to market" automobiles. Compl. ¶ 1.

In 2003, EVOX entered into a copyright licensing agreement (the Agreement) with Chrome, allowing Chrome to sublicense EVOX's copyrighted images to third parties. Compl., Ex. 2. EVOX now claims that Chrome breached the Agreement by failing to submit appropriate records of sublicense fees; under-reporting the amount of sublicense fees it received; failing to pay EVOX the full amount of sublicense fees; and failing to protect EVOX's intellectual property. Compl. ¶ 61. EVOX also brings a claim for vicarious or contributory copyright infringement against Chrome, alleging that Chrome "knowingly induced, participated in, aided and abetted in, and profited from Unauthorized Sublicensees' infringements of the Copyrighted Photographs." Compl. ¶ 51.

Chrome now moves for summary judgment, contending that EVOX's claims are time-barred. Chrome argues that the record shows as a matter of law that EVOX either had actual knowledge of, or should have discovered, Chrome's alleged breaches of the Agreement and copyright infringement more than two years[2] before EVOX filed this action on January 13, 2016. For the following reasons, I recommend granting Chrome's motion for summary judgment in part, ruling that EVOX's claims for breach of contract are time-barred, and that EVOX's copyright infringement claim is time-barred to the extent that EVOX bases its claim on Chrome's

---

[2] As discussed below, I conclude that EVOX's copyright infringement claim is subject to the Agreement's two-year limitation period, rather than the three-year statute of limitations for copyright infringement. 17 U.S.C. § 507(b). It is undisputed that EVOX's breach of contract claims are subject to the Agreement's two-year limitation period. Pl.'s Opp'n 29, ECF No. 83.

alleged acts that occurred before January 13, 2014.

## BACKGROUND

The following background facts are stated in the light most favorable to EVOX, the non-moving party. *See Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011). The facts are primarily from exhibits submitted by Chrome, which include EVOX's internal emails discussing Chrome's compliance with the parties' Agreement, and correspondence between the parties concerning the Agreement.[3] In response, EVOX relies almost entirely on the declaration of Barry Thompson, an EVOX executive. Thompson Decl., ECF No. 84.

Thompson has worked for EVOX since 2008, initially as Chief Financial Officer and Vice President of Operations, and now as Vice President of Compliance, responsible for enforcing EVOX's intellectual property rights. Thompson Decl. ¶ 2. Thompson states that he has "been personally and directly involved with managing EVOX's relationship with Chrome from 2008 through the filing of this lawsuit, including EVOX's negotiations with Chrome regarding entering into a new license agreement and side letters[4] to the existing agreement, including EVOX's audits and attempted audits of Chrome." *Id.* ¶ 3.

The parties' Agreement permitted Chrome to sublicense EVOX's copyrighted photographs. The Agreement granted Chrome access to EVOX's Automotive Image Library through a File Transfer Protocol website, allowing Chrome to identify and download updated photographs. During the parties' contractual relationship, Chrome accessed EVOX's Image Library regularly, downloading photographs. Thompson Decl. ¶ 4. Chrome then provided its

---

[3] *See* Giberti Decls. & Exs. 2-45, ECF Nos. 78, 79; Giberti Suppl. Decl., Exs. 46-49, ECF Nos. 88, 89; Giberti 2d Suppl. Decl., Exs. 50-51, ECF No. 97; Stack Decl., Exs. 1-2, ECF No. 98.

[4] "Side letter" is the parties' term for an extension of the original Agreement.

sublicensees with varying degrees of access to its database of EVOX's images.  The Agreement

required that "within fifteen days after the end of each calendar month," Chrome would send

EVOX "a complete report . . . of [Chrome's] total usage, and Net Revenues during the calendar

month."  Agreement § 3.4.1.  The Agreement defined "Net Revenue" as "all revenue earned by

[Chrome] from sublicensing the Licensed Database less sales or use taxes."  Agreement § 1.10.

Thompson states that "Chrome would send EVOX reports that purportedly reflected

sublicensee use of EVOX's images and the associated fees that Chrome owed to EVOX."

Thompson Decl. ¶ 5.  Because Chrome could not monitor its sublicensees' usage of EVOX

images,[5] Chrome relied on its sublicensees to self-report their usage to Chrome.  Chrome then

reported the sublicensees' usage to EVOX.  Chrome, in its relationship with its sublicensees, and

EVOX, in its relationship with Chrome, relied on this honor system of self-reporting, subject to

verification through contractual audits.  As counsel for Chrome explained, "the sublicensees

could access the EVOX images, and then they would report to Chrome at the end of the month, 'I

downloaded six pictures of a Nissan and a video of an Ultima.'  And those were charged at a

certain rate.  'So I now owe you X number of dollars.'"  1st Tr. 12 (April 4, 2018 hearing), ECF

No. 93.  As the record shows, the honor system did not always work smoothly for Chrome or

EVOX.

The Agreement gave EVOX the right to hire an independent auditor at its own expense

"to verify sales figures relevant to this Agreement and [Chrome] will make all relevant

information available for this type of review."  Agreement § 6.6.  If an audit determined that

---

[5] Counsel for Chrome explained that current technology would allow a sublicensor like Chrome "to monitor usage by sublicensees," but during the relevant time, "Chrome could not audit its sublicensees to determine if they were being truthful in their reporting of their usage."  1st Tr. 13 (April 4, 2018 hearing).

Chrome had "underreported sales figures by more than five percent (5%) in any period, [Chrome] will reimburse eVOX for all audit costs." Agreement § 6.6. EVOX audited Chrome's sublicense accounts in 2008 and 2010, Thompson Decl. ¶ 5, working directly with Chrome rather than retaining an independent auditor for these two audits.

The Agreement had been set to expire in February 2008. Thompson Decl. ¶ 6. However, the Agreement allowed Chrome to continue providing EVOX's photographs to Chrome's sublicensees for one year after the Agreement's expiration, until February 14, 2009.

The parties entered into side letters that extended their contractual relationship, so that EVOX continued licensing its photographs to Chrome, and Chrome continued sublicensing the photographs to third parties. The parties' side letters provided that Chrome's rights to enter into new sublicenses and to renew existing sublicenses would expire by January 2012. Thompson Decl. ¶ 6. EVOX allowed Chrome to continue servicing its existing sublicense agreements until those agreements expired. Thompson states that because Chrome entered into sublicensing agreements directly with sublicensees, "and did not disclose the actual agreements to EVOX, EVOX had to rely on Chrome to enforce the expiration date of the sublicense agreements." Thompson Decl. ¶ 6.

On May 28, 2008, Thompson addressed a letter to Chrome, "identifying 53 sublicenses that EVOX believed Chrome had failed to report to EVOX." Thompson Decl. ¶ 6. Thompson's May 28, 2008 letter listed the "potentially unreported" sublicenses, with each sublicense's effective date and expiration date. Giberti Decl., Ex. 2, at Evox_Chrome (E_C) 006125-26. Thompson asked Chrome to review his list of "potentially unreported sublicenses" and confirm whether each sublicensee had made payments to Chrome; if the sublicensee had made payments, the months in which the sublicensee had paid Chrome and the name of the sublicensee; if the

sublicense was for a term of more than 12 months, confirm that EVOX had approved the "exceptional term" in writing; and if Chrome confirmed that license fees had been under-reported, Chrome was to calculate the amount of under-reported fees, add interest of 1.5% per month, and reimburse EVOX. *Id.* at E_C006126. Thompson also asked Chrome to review its records on specific sublicenses or possible sublicenses. Thompson cited payments to Chrome for the March 2007 NADA (National Automobile Dealer Association) Guides. Chrome had reported receiving $12,000 gross from NADA, with $7,200 net to EVOX. Thompson stated, "Perhaps the gross fee should have been reported as $65,000 and the amount due to eVox should be $39,000." *Id.* at E_C006127.

In the May 28, 2008 letter, Thompson also asked Chrome to review the account of a sublicensee that had been providing EVOX images to US News & World Report. As to this account, Thompson wrote that because of "the low fees being generated ($475/month) from this portal, I would like to review the validity of the Sublicense and understand how eVox approved this exceptional rate." *Id.* Thompson further wrote that EVOX's records indicated that one possible sublicensee, Trilogy, had "once considered licensing eVox Images through Chrome but did not conclude a contract with Chrome. eVox is reviewing potential unlicensed uses of eVox images by Trilogy. Please conrriem [*sic*] that Trilogy is not (and has not been) a Chrome client." *Id.* Thompson requested "excel format copies of the monthly Chrome Usage reports from January 1, 2006 to the current date." *Id.*

Thompson now states that he drafted the May 28, 2008 letter to Chrome while the parties were negotiating a possible renewal of the Agreement, as "part of EVOX's normal efforts to confirm that Chrome was properly accounting for sublicense fees. In the course of those efforts, Chrome transmitted a report to EVOX listing its sublicense accounts." Thompson Decl. ¶ 8.

Thompson states that EVOX was previously unaware of these 53 Chrome sublicenses, and
EVOX had not received sublicense fees for them, but because the Agreement allowed Chrome to
enter into sublicense agreements without EVOX's prior approval, the 53 sublicenses were not
necessarily unauthorized by EVOX.  According to Thompson, the "primary issue" raised by his
May 28, 2008 letter "was whether Chrome had reported and paid the relevant sublicense fees to
EVOX." Thompson Decl. ¶ 8.

On the same day Thompson drafted the letter to Chrome, EVOX executives discussed by
internal email "[i]ssues with [Chrome] reports so far and what we want." Giberti Decl., Ex. 3, at
E_C005461.  EVOX's Chief Executive Officer David Falstrup listed EVOX's concerns that (1)
Chrome was issuing multi-year sublicenses in breach of the Agreement; (2)  Chrome was issuing
"licenses not shown on the reports"; (3) Chrome had possibly under-reported fees paid by its
sublicensees, such as for the NADA guides; and (4) Chrome "may be under charging for the use
granted." *Id.* at E_C005461-62.  Falstrup stated that EVOX wanted a three-year mapping[6]
agreement with Chrome "to match the length of the sublicenses in place"; a "reduced share to
[Chrome] for the length extending beyond the 1 year permitted"; "[c]orrect reporting of fees and
full payment of fees due including penalties"; and "Chrome as a VAR [value-added reseller] as
per our proposal." *Id.* at E_C005462.

On June 11, 2008, Falstrup sent an internal email to other EVOX executives, discussing
possible negotiation tactics to reach a new master licensing agreement with Chrome.  Giberti
Decl., Ex. 4.  Falstrup wrote, "Signing the side-letter as-is would give [Chrome] the rights to
have the sublicenses in place for up to three years and receive 40% on these." *Id.*, at E_C004259.

_____

[6] "In simple terms, 'mapping' is a data solution that connects the [*sic*] EVOX's Photographs with
relevant data about the depicted cars, which enhances use of the Photographs on automotive dealer and
other websites." Thompson Decl. ¶ 33.

Falstrup stated that EVOX's goal was "to get Chrome past the idea that Legal can hold onto the Mapping as a way to get us to sign the side letter and let them off their liabilities. We are not going to let them off their liabilities just in exchange for a mapping deal as written." *Id.*, at E_C004260. Falstrup proposed "a potential deal" between Chrome and EVOX, which would allow Chrome to enter into "their 3-year deals" (i.e., sublicenses), and to give Chrome a

> 20% share during any term that extends beyond the 12 months they were permitted to give (vs the 0% they are entitled to). [This] lets them off the hook for writing sublicenses they had no right to. The cost to us is the 20%, not having the direct relationship, and not being able to go in and make our own multi-year deals at this time.

*Id.*

On June 12, 2008, EVOX Vice President Scott Shipley sent Chrome a letter noting "some potentially significant issues that will need resolution before eVox will be in a position to sign the Side Letter." Giberti Decl., Ex. 5, at E_C004266. In the letter, Shipley wrote, "We have identified 53 account names that we need to perform additional review procedures on as it appears that eVox has not been compensated for all of these accounts." *Id.* Shipley wrote that it would be in the best interest of both EVOX and Chrome to sign a one-year "Mapping Agreement," allowing the parties time to resolve pending issues about a side letter extending the Agreement. *Id.*, at E_C004267.

On June 13, 2008, Peter Batten of Chrome responded to Shipley's letter by email. Batten wrote, "How would you like to resolve this? Chrome Accounting will need to research each item and provide the information you requested." Giberti Decl., Ex. 6, at E_C004280. Shipley agreed to set a conference call with EVOX in about two weeks.

On October 14, 2008, Shipley emailed Batten a list of Chrome accounts to discuss. Giberti Decl., Ex. 11. Shipley listed five accounts EVOX suspected were committing copyright

violations, four accounts that EVOX suspected were under-reported, and multiple other accounts

that EVOX suspected were underpriced or unauthorized. *Id.*, at E_C001425-26.

In a February 10, 2009 internal email to EVOX's CEO Falstrup, Thompson provided a

progress report, listing his goals and progress towards reaching them. Giberti Decl., Ex. 18.

Thompson stated that EVOX had collected "$280K in compliance collections including $165K

from Chrome." *Id.*, at E_C006761.

Under the heading "Contract Management & Support," Thompson's report referred to

Chrome, stating, "Settlement payments for underreporting contract. Audit? NADA guides?

Bring this to resolution. Collect the money owed before end of 08. . . . Possible Copyright

case?" *Id.*, at E_C 006763. In the same document, under the heading "Rights enforcement

system," Thompson mentioned developing "a compelling presentation of facts to encourage top

notch legal firms to internally justify taking [EVOX's] work on a 100% contingency basis." *Id.*,

at 006764. Under the goal "Initiate first Targets," the document states, "Done. Mostly Chrome

Targets." *Id.* Thompson now states that the phrase "possible copyright case" referred to

EVOX's efforts "to identify prior sublicensees of Chrome that were continuing to use EVOX's

Photographs after their sublicense relationship with Chrome had ended and does not reflect any

suspicion by EVOX that Chrome itself was engaging in wrongdoing." Thompson Decl. ¶ 21.

The parties entered into a side letter agreement in 2009. *See* Giberti Decl., Ex. 23, at

E_C004917 (referring to side letter). In May 2009, EVOX asked Chrome to provide information

on grandfathered sublicense accounts that Chrome continued to service. In January 2010,

Chrome sent EVOX an updated list of its sublicensees that were covered by the side letter

agreement. Giberti Decl., Ex. 20. The sublicensees included Potratz Partners Advertising, Inc.

(Potratz). *Id.*, at E_C004469. EVOX now alleges that Potratz later became an unauthorized

sublicensee of Chrome.  Compl. ¶ 3.

In 2010, EVOX conducted a "cooperative audit effort of Chrome."  Thompson Decl. ¶ 23.  In September 2010, EVOX began limiting its approval of Chrome's sublicense agreements to 30-day renewals rather than the annual renewals EVOX had previously allowed, "in an effort to push forward progress on the Master Agreement."  Thompson Decl. ¶ 27.  In mid-2011, Chrome stopped requesting renewals from EVOX, which Thompson states EVOX interpreted to mean that Chrome was not renewing sublicenses as they expired.  Thompson states that in 2011, EVOX did not know the terms of Chrome's sublicenses, so when EVOX received Chrome's usage reports on sublicenses from May 2011 to September 2014, Plaintiff "assumed that those sublicenses had not yet expired."  Thompson Decl. ¶ 27.

On December 15, 2010, in preparation for an EVOX meeting to discuss "Chrome Strategy," Thompson sent an internal email to other EVOX executives, attaching a document entitled, Chrome Update:  Business Overview.  Giberti Decl., Ex. 21.  In the Business Overview, Thompson wrote that Chrome had admitted it lacked the "account over sight in place to effectively monitor client usage."  Giberti Decl., Ex. 21, at E_C004867.  Thompson noted that "Chrome has a total of 44 accounts that use eVox images, producing $617k in annual revenue before Chrome's 15% commission."  *Id.*

Also on December 15, 2010, in an EVOX internal email, Thompson forwarded an email from EVOX CEO Falstrup.  Giberti Decl., Ex. 22.  Falstrup wrote, "It's possible chrome [*sic*] has some potentially large exposure to us due to underreporting by sublicensees and/or chrome underpricing for the uses.  We want to be careful before we let them off the hook for this and need to get a quantification of what this is worth."  Giberti Decl., Ex. 22, at  E_C004870.  Falstrup emphasized the importance of EVOX's ability to establish relationships with "the

accounts transitioned from chrome to eVox direct.  Both an opportunity and a risk." *Id.*
Falstrup's statement indicates that by 2010, EVOX was seeking to reach its own licensing
agreements directly with Chrome's sublicensees.

On December 28, 2010, Thompson wrote Chrome's senior product manager, Chip
Wallace, stating EVOX had learned that a former sublicensee of Chrome, Gabriels Technology
Solutions, Inc. (Gabriels), was displaying EVOX's copyrighted images after Gabriels's
sublicense had expired March 31, 2010.  Thompson wrote to Wallace that EVOX had "evidence
that Gabriels continues to display the eVox Imagery obtained in connection with the expired
Chrome Sublicense without a license from eVox to do so.  They do not appear to be displaying
any eVox Licensed Materials produced after March 31, 2010." Giberti Decl., Ex. 25, at
E_C007612.  Thompson asked for Chrome's cooperation (1) to confirm that the Chrome
sublicense with Gabriels had expired on March 31, 2010; and (2) to provide EVOX "with all
relevant documents concerning the licensing of eVox Licensed Materials to Gabriels." *Id.*
Thompson advised Chrome not to "take any steps that could be construed as aiding or abetting
Gabriels (such as Gabriels asking Chrome to retroactively agree to contract extensions, etc.) in
what appears to be significant infringements of EVOX's intellectual property by Gabriels.  This
statement obviously applies to all expired Sublicenses."  Giberti Decl., Ex. 25, at E_C 007612.
Also on December 28, 2010, EVOX's general counsel, Stuart Pardau, sent a letter to the
president of Gabriels, stating that EVOX was aware that Gabriels was continuing to display
EVOX's copyrighted photographs after Gabriels's sublicense from Chrome had expired.  Giberti
Decl., Ex. 24, at Ex. D (First Am. Compl., Ex. D, *Evox Prods., LLC v. Gabriels Tech. Sols., Inc.*,

No. 13-cv-00846-CJC-RZ) (C.D. Cal.) (*Gabriels*)).[7]

On December 29, 2010, Wallace, Chrome's product manager, emailed Thompson copies of communications between Chrome and Gabriels.  Giberti Suppl. Decl., Ex. 46, ECF No. 88. Wallace attached a copy of an email dated March 1, 2010, to Gabriels from Dan Walls, a business development manager for Chrome, stating, "Just wanted to send a reminder that Evox license from Chrome terminates at end of March.  If you want to continue Evox, you will need to negotiate with Evox directly, we can still provide the mapping table.  Please let me know if you need Evox contact info."  *Id.*, at E_C007606.  Wallace also attached what he described as "the info from a call logged by Dan Walls on 4/13/2010."  In that call to Gabriels, Walls reiterated that "the license for Evox deliverables expired March 31.  Chrome no longer has a contract to sell Evox and we have to terminate Evox when it comes up for renewal."  *Id.*

In 2012, EVOX began preparations to audit Chrome's sublicense accounts.  As noted, the Agreement authorized EVOX to conduct audits, stating that EVOX, "[a]t its sole cost and upon reasonable written notice" to Chrome, "will be permitted to hire an independent auditor to verify sales figures relevant to this Agreement and [Chrome] will make all relevant information available for this type of review."  Agreement § 6.6.  The Agreement further provided that if the audit showed Chrome had under-reported sales figures by more than 5% for any period, Chrome would reimburse EVOX for all audit costs.  *Id.*

On July 16, 2012,  Amanda Denery, EVOX's compliance manager, emailed Thompson,

---

[7] I grant Chrome's unopposed requests to take judicial notice of documents filed by EVOX in the *Gabriels* action, and documents filed in *EVOX Prods., LLC v. Adicio, Inc.*, No. CV 16-4684-R (C.D. Cal. Nov. 29, 2016) (*Adicio*).  ECF Nos. 80, 99.  *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) (court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

Page -12- FINDINGS AND RECOMMENDATION

giving a proposed ten-step procedure for conducting the Chrome audit. Giberti Decl., Ex. 28.

Denery stated she was working on the first step, compiling reported data. As to the second step,

"Get URLs from Chrome," Denery asked Thompson whether she should "tell them [Chrome] flat

out I am auditing them, or play down the audit and talk to Chip [Wallace] about my exciting new

database of licensed URLs and how I need all the active Chrome URLs in place going forward."

*Id.*, at E_C005063. Denery stated that she would like to proceed with the second step

"tomorrow."

On August 7, 2012, Denery emailed Thompson, EVOX general counsel Pardau, and Jeff

Mancino, apparently an EVOX executive. Denery wrote,

> Since we are about to embark on a full Chrome Audit - it seems logical to do this
> all at once (also, per their agreement we will only audit them once in any 12-
> month period - it does not clarify whether that will be a full or partial audit).

> My initial thought is to request that they [*sic*] audit be performed in 3 segments,
> Group A is the BIG accounts (including NADA & Homenet), Group B is the 2nd
> rung accounts and Group C is all remaining smaller sub-licensees. Their
> Agreement states they will be given 15 days notice - if we send this by the end of
> the week, Group A results have 2 weeks, then each subsequent Group deadline is
> given 2 weeks apart.

Giberti Decl., Ex. 29, at E_C005065.

Denery attached a draft letter notifying Chrome about the audit. The draft letter stated

that pursuant to "Chrome Systems license agreement, 20110622(Chrome)-Agr Rev B," EVOX

"wishes to exercise Audit Rights." *Id.*, at E_C005066 (italics omitted). The draft letter

continued, "Evox's intention is to perform a thorough audit of all Chrome sub licensee's usage of

Evox content from inception to date. To simplify this process, we are requesting submission of

all relevant records in three groups." *Id.* After providing an outline of the proposed schedule for

the audit, the draft letter stated, "For purposes of this audit, Evox requires name, URL, effective

dates (start and stop), complete list of Evox assets and use types and any and all other relevant

Page -13-  FINDINGS AND RECOMMENDATION

documentation for all end-users." *Id.*  On August 13, 2012, Thompson approved Denery's draft letter to Chrome.  Giberti Decl., Ex. 30.  Later that day, Denery emailed the letter to Wallace. Giberti Decl., Ex. 31.

On August 17, 2012, Wallace responded to EVOX's request for an audit.  He wrote, "I think you may have reference [*sic*] the incorrect agreement, I believe these clients would be governed under the October 2003 agreement."  Giberti Decl., Ex. 31, at E_C000338.

On August 27, 2012, Denery replied to Wallace, writing, "I believe the 2011 Agreement superceded [*sic*] the prior, regardless, the 2003 Agreement also allows for audit rights.  Please let me know if you have any additional questions.  Otherwise, I will look forward to Group A records at the end of this week."  Giberti Decl., Ex. 32, at E_C000340.

Wallace responded to Denery by email that day:

> The new agreement is specific to our OEM comparison clients and does not cover the clients that receive assets.  The 2003 agreement does allow for audit rights and if you identify your independent auditor we can get the appropriate paperwork completed to perform the audit.  Please don't hesitate to contact me if you have questions.

Giberti Decl., Ex. 33, at E_C005110.

As part of EVOX's planning for the Chrome audit, Eric Shing, contracts manager for EVOX, sent an email on August 29, 2012 to Thompson.  Shing provided notes from an EVOX meeting discussing the proposed Chrome audit, stating, "We need to look for sublicensees added by Chrome after the side-letter preventing such additions was executed; . . . Look for delayed payment processing by Chrome."  Giberti Decl., Ex. 34, at E_C 005197.  Shing wrote that Chrome was paying EVOX its share of sublicense fees only after the sublicensee had paid Chrome, although EVOX interpreted the Agreement to require that Chrome pay EVOX when fees were due regardless of whether the sublicensee had paid Chrome.  In a separate internal

Page -14-  FINDINGS AND RECOMMENDATION

email sent on August 29, 2012 to EVOX executives, including Denery and Thompson, Shing confirmed that EVOX had audit rights regardless of the applicable agreement: "No revisions were made to the audit clause in any subsequent amendments to the 2003 agreement." Giberti Decl., Ex. 35, at E_C005198.

In September 2012, EVOX considered whether to retain Jacques Welche of the Romano Petit Group to be the independent auditor for the Chrome audit. On September 10, 2010, Denery emailed EVOX's general counsel Pardau, CEO Falstrup, Thompson, Mancino, and Shing about retaining Welche as independent auditor. Giberti Supp. Decl., Ex. 49, ECF No. 89. Denery's email described "two potential approaches": (1) purchase a block of hours initially so the auditors could work with EVOX "to define the scope of the project - request data from Chrome - review the Agreement(s) & prior usage reports & scope out a complete Agreed Upon Procedure"; or (2) use an "Agreed Upon Procedure," which was the "more detailed & defined approach, listing out step by step what actions will be taken, each party would sign off on them & we would proceed - in order to even scope this, we would need to start with some Consulting hours." *Id.*, at E_C005200. Denery stated that if EVOX determined that the audit was "likely to expand into something beyond simple collection, it may be in our best interest to have more of the data auditing handled by this 3rd party." *Id.* Denery noted that Lotta Franzen, a "management level auditor" who worked with Welche, charged a standard rate of $225 per hour, although Romano Petit was offering "20% off since this is [EVOX's] first use of their services." *Id.* Denery stated that EVOX could initially "purchase a block of hours," and Welche had suggested 20 hours for about $3,400. *Id.*

Denery stated that she could "proceed immediately" with drafting an outline of reporting requirements in the agreements with Chrome, and reviewing a summary of usage reports "with

the side letter mentioned in the last Chrome Audit meeting & determine what, if any, sub-licenses were added after that time." *Id.* Denery concluded her email by asking how to proceed with the audit: "Do we need a meeting with all heads in the room to discuss or can we get some movement via email? If we need to meet, when are you all available to do so?" *Id.*, at E_C005201.

On October 3, 2012, EVOX held an internal "compliance meeting," with an agenda prepared by Denery. Giberti Decl., Ex. 36. EVOX CEO Falstrup, Thompson, EVOX general counsel Pardau, Shing, and Mancino attended the compliance meeting. The minutes of the meeting state that Chrome's "usage reports for 2011 & 2012 are compiled (overall trend, their usage of EVOX has taken a nose-dive, not surprising considering their new venture[8]). Chrome has responded to audit notice -- looks like we need to hire a 3rd party auditor." *Id.*, at E_C005208. The minutes also state, "It was agreed; Evox Images will request all items as outlined," including "ALL license agreements for the past three (3) years, Evox will prepare of [*sic*] list of specifics and priorities." *Id.* (bolding omitted).

On May 14, 2013, EVOX general counsel Pardau sent Chrome a letter by email and by certified mail, seeking to review sublicense agreements between Chrome and NADA guides. Giberti Decl., Ex. 40. Pardau wrote, "My client advises that pursuant to EVOX's audit rights under the Agreement, an audit of Chrome's sublicensing activities has already commenced and as [*sic*] currently under review by EVOX." *Id.*, at E_C10454.

EVOX never completed the 2012 audit of Chrome. There is no contemporaneous evidence in the record concerning EVOX's decision to abandon the audit. Thompson now states

---

[8] The "new venture" apparently refers to Chrome's decision to begin "developing its own automotive image database," putting Chrome in direct competition with EVOX. Def.'s Mot. Summ. J. 3, ECF No. 77.

he concluded the cost of hiring a third-party auditor "seemed to outweigh the amount EVOX had any reason to expect the audit to reveal" EVOX was owed, based on prior audits of Chrome. Thompson Decl. ¶ 28. Thompson also states, "EVOX was unable to locate an appropriate independent auditor to conduct the audit and so the audit did not proceed." Thompson Decl. ¶ 29.

On January 3, 2013, Michael Cole, a compliance manager for EVOX, sent an internal email to EVOX's executives about Potratz, the advertising agency that had been a Chrome sublicensee. Cole stated, "In our last compliance meeting we discussed the possibility of Potratz using Evox Assets without a contract. After further investigation, they obtain our images through Chrome." Giberti Decl., Ex. 37, at E_C007302.

On February 6, 2013, EVOX filed an action against Gabriels in the U.S. District Court for the Central District of California, asserting claims for copyright infringement, contributory copyright infringement, trademark infringement, unfair competition, and Lanham Act violations. Compl. ¶ 37; *see* Giberti Decl., Ex. 24 (First Am. Compl. in *Gabriels*). During discovery in *Gabriels*, in January 2014 EVOX asked Chrome to provide records of its sublicense with Gabriels. As noted, Gabriels had been a sublicensee of Chrome until March 31, 2010. In December 2010, EVOX had requested information from Chrome about its sublicense with Gabriels during an investigation of Gabriels. Thompson now refers in his declaration to a "payment report produced to EVOX on January 14, 2014," as EVOX's first notice of Chrome's alleged breaches of contract and copyright violations. Thompson Decl. ¶ 31. Thompson states that the payment report

> allowed EVOX for the first time to compare the actual fees paid by Gabriels to
> Chrome with the agreed-upon rates, licensed materials used, the number of
> websites hosted by Gabriels, and other information. Based on my analysis, which
> I concluded in late January 2014, I was able to determine that Chrome had failed

to report and pay the majority of the fees owed to EVOX based on Gabriels' use
of the Photographs.

Thompson Decl. ¶ 31.

EVOX did not attach the payment report to Thompson's declaration. Nor was the

payment report part of the summary judgment record. Because of the payment report's apparent

significance to EVOX's timeliness argument, I ordered EVOX to produce the payment report,

and allowed the parties to brief its significance. 2d Tr. 22 (April 18, 2018, hearing), ECF No. 94.

EVOX has now submitted the payment report, which is a two-page document showing

amounts paid monthly to Gabriels by each of its "Vehicle Portal Clients," covering August 2005

through March 2010, when Gabriels's sublicense with Chrome terminated. Pl.'s Suppl. Br., Ex.

1, ECF No. 95. Chrome sent the payment report to EVOX within two business days of EVOX's

2014 request. Although the payment report bears a date stamp of "1/10/14," that appears to be

that date that the payment report was last printed by Chrome before sending it to EVOX, rather

than the date the report was initially created.

Gabriels's Vehicle Portal Clients were primarily newspaper websites, such as the

Houston Chronicle, the Orange County Register, the Seattle Times, and the New York Times. In

the payment report, Gabriels listed the amounts it had received from each client, either $110 or

$270 per month per account. The monthly fees, which were self-reported by Gabriels, were

based on the number of photographs that each Gabriels's client used, and on the number of

expected unique views per month for each client. Pl.'s Suppl. Brief 3-4.

In December 2010, when EVOX was investigating whether Gabriels had infringed on its

copyrighted images, Chrome sent EVOX the agreed rate schedules for several Chrome

sublicensees, including Gabriels. Giberti Decl., Ex. 26, at E_C005056 (table showing rates for

Gabriels's use of EVOX images); Pl.'s Suppl. Brief 3. EVOX now states that, using the rate

Page -18-  FINDINGS AND RECOMMENDATION

schedule for Gabriels's clients, the payment report shows Gabriels charged its clients based on the use of "11 Still Photos" per month by small or medium circulation newspapers, when in fact many of the clients, such as the New York Times, should have been charged at a higher rate. Thompson states that he "personally reviewed and analyzed these documents, particularly the payment report, which allowed EVOX for the first time to compare the actual fees paid by Gabriels to Chrome with the agreed-upon rates, licensed materials used, the number of websites hosted by Gabriels, and other information." Thompson Decl. ¶ 31.

In a brief filed on March 17, 2014 by EVOX in the *Gabriels* litigation, EVOX stated that Thompson had "conducted research from publicly available internet sources" to determine that Gabriels had under-reported and underpaid for its use of EVOX images. Giberti 2d Suppl. Decl., Ex. 50, at 4 (EVOX Opp'n Br. to Gabriels Mot. Limine No. 2, *Gabriels*), ECF No. 97-1. In another brief EVOX filed in the *Gabriels* litigation, EVOX asserted that its evidence would show "EVOX first learned of [Gabriels's] infringing use in or around November 2010." Giberti 2d Suppl. Decl., Ex. 51, at 19 (EVOX Mem. Contentions of Fact and Law 13). According to Chrome, EVOX later settled with Gabriels on undisclosed terms.

## LEGAL STANDARDS

### I. Motions for Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, "[i]ssues of fact do not preclude summary judgment unless they are material to the substantive claim at issue; that is, unless they 'might

affect the outcome of the suit under the governing law.'" *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The substantive law governing a claim or defense determines whether a fact is material. *See id.*

## II.  Statutes of Limitations

"[S]tatutes of limitations are affirmative defenses, not pleading requirements." *Wyatt v. Terhune*, 315 F.3d 1108, 1117 (9th Cir. 2003) (citing Fed. R. Civ. P. 8(c)), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc).  "A defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred." *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995).  But when a defendant moving for summary judgment meets its initial burden of showing that the applicable statute of limitations would bar the plaintiff's claim, as Chrome has done here, then the plaintiff has the burden of showing that an exception to the statute of limitations applies, such as the discovery rule or equitable tolling. *See O'Connor v. Boeing N. Am.*, 311 F.3d 1139, 1150 (9th Cir. 2002) ("Because plaintiffs have the burden of proof at trial to establish that they are entitled to the benefit of the discovery rule, to defeat summary judgment they [are] required to come forward with evidence establishing a triable issue of fact with regard to whether the discovery rule applies."); *see also Garcia v. Coleman*, No. C-07-2279 EMC, 2008 WL 4166854, at *5 (N.D. Cal. Sept. 8, 2008) (when "a plaintiff contends that the statute of limitations is not a bar based on the discovery rule or equitable tolling, the plaintiff bears the burden of proving the applicability of such") (citing *V.C. v. Los Angeles Unified Sch. Dist.*, 139 Cal. App. 4th 499, 516, 43 Cal. Rptr. 3d 103 (Cal. Ct. App. 2006) ("It is plaintiff's burden to establish facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or

presumptive knowledge of facts sufficient to put him on inquiry.") (internal quotation marks

omitted); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1218 (9th Cir. 1980) ("the plaintiff has the

burden of proving facts that would toll the statute")).

## DISCUSSION

The parties' Agreement sets a two-year limitation on bringing legal actions arising out of

the Agreement:

> No action, regardless of form, arising out of this Agreement may be brought by
> either Party more than two years after the cause of action arose.

Agreement § 13.5. The Agreement also addresses venue and choice of law. Section 11.3 is a

forum selection clause, providing that all disputes brought by EVOX will be resolved by state or

federal courts in Portland, Oregon, while all disputes brought by Chrome will be resolved by

state or federal courts in Los Angeles. Agreement § 11.3. Section 11.1 is a choice of law clause,

providing that the Agreement is to be construed under California law. *Id.*, at § 11.1. I first

address the timeliness of EVOX's breach of contract claims, and then the timeliness of the

copyright infringement claim.

## I. EVOX's Discovery of Chrome's Alleged Breach of Contract

### A. California Legal Standards for Accrual of Breach of Contract Claims

Under California law, a breach of contract claim generally accrues when the breach

occurs, "regardless of whether any damage is apparent or whether the injured party is aware of

his right to sue." *Perez–Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal.

2006). To mitigate the harshness of this rule, California courts recognize the "discovery rule,"

which provides that "a cause of action accrues when the plaintiff discovers or could have

discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of

action." *Id.* "California courts generally interpret contractual statute of limitations as

incorporating California's discovery rule, in order to avoid unfair or unreasonable applications of the limitations period." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) (citing *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430, 131 Cal. Rptr. 2d 684 (Cal. Ct. App. 2003)).

There are generally three circumstances that support applying the discovery rule to a claim for breach of contract: "(1) '[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect'; (2) 'the defendant has been in a far superior position to comprehend the act and the injury'; and (3) 'the defendant had reason to believe the plaintiff remained ignorant he had been wronged.'" *Perez-Encinas*, 468 F. Supp. 2d at 1135 (quoting *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 5-6, 131 Cal. Rptr. 2d 680 (Cal. Ct. App. 2003)). California courts apply the reasonable diligence standard to breach of contract claims only in "select cases." *Gabriel Tech. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1010 (S.D. Cal. 2012).

**B. Discussion**

I conclude that EVOX's breach of contract claims are time-barred. The record shows as a matter of law that even if EVOX was not actually aware of violations of the Agreement, EVOX failed to exercise reasonable diligence to investigate whether Chrome was in breach of the Agreement before January 13, 2014, two years before EVOX filed the Complaint.

I note initially that Chrome's assertions that it did not breach the Agreement or infringe EVOX's copyrights appear to conflict with Chrome's assertion that EVOX should have discovered Chrome's misconduct. Based on this apparent paradox, EVOX argues "Chrome does not explain how EVOX could have discovered something that Chrome claims did not happen." Pl.'s Opp'n 31 n.6. However, I conclude Chrome's positions do not conflict because Chrome's current motion for summary judgment does not challenge the substance of EVOX's claims, only

their timeliness.

As to timeliness, EVOX's internal email discussions show that in 2008, EVOX suspected that Chrome was violating the Agreement by failing to report its sublicenses, under-reporting revenue received from sublicensees, and undercharging sublicensees. *See, e.g.*, Giberti Decl., Ex. 3, E_C005461-62. In his declaration, Thompson now acknowledges, "As the CFO of EVOX in 2008, I can state that while EVOX was concerned with 'underreporting or non-reporting by Chrome' of sublicense fees at this time, EVOX understood that the parties were addressing and resolving these issues through normal business channels and the issues of which EVOX was aware at the time did not support formal legal action (and certainly not with respect to EVOX's intellectual property)." Thompson Decl. ¶ 16.

I agree with Chrome that EVOX's attempts to resolve its license disputes with Chrome through negotiations rather than litigation did not toll the Agreement's limitations period. In *EVOX Productions, LLC v. Adicio, Inc.*, No. CV 16-4684-R (C.D. Cal. Nov. 29, 2016) (*Adicio*), a copyright infringement action brought by EVOX against Adicio, Inc., a sublicensee of Chrome, the district court rejected a similar tolling argument. Giberti Decl., Ex. 45. The court explained why EVOX's negotiations with Adicio did not toll the limitations period:

> Plaintiff's argument that the negotiations concealed ongoing copyright violations is unconvincing. First, if Plaintiff was in the midst of negotiations to retroactively authorize uses by parties in the position of Defendant, then it was aware that such uses were occurring after the expiration of the initial agreement. There would be no need to *retroactively* authorize anything if no one was using the images after the January 2012 expiration. Second, the fact that the negotiations failed has no impact on the statute of limitations or accrual of copyright claims. There is no exception to the accrual rule in [*Roley v. New World Pictures, Ltd.*, 19 F.3d 479 (9th Cir. 1994)] for the beliefs or intentions of a copyright holder. The accrual rule is only interested in whether the copyright holder knew or should have known of the alleged infringement. While Plaintiff may well have been justified in its belief that a new agreement would materialize, it held that belief at its own risk. Once Plaintiff knew that Defendant was infringing on its copyrights, the statute of

limitations began to run.

*Adicio*, at 3; *see also Tomas v. Gillespie*, 385 F. Supp. 2d 240, 248 (S.D.N.Y. 2005) ("the mere existence of ongoing settlement negotiations is insufficient to estop a party to assert the statute of limitations as a defense") . The *Adicio* court also noted, "There is no qualification in the statute of limitations which prevents a claim from being filed during negotiations." *Id.* at 3.

      *Adicio*'s reasoning applies to the breach of contract claims at issue here.  The record shows that EVOX was aware of Chrome's apparent under-reporting and failure to report fees received from sublicensees, which would be violations of the Agreement, yet EVOX chose to negotiate with Chrome rather than bring a lawsuit against Chrome.  EVOX may have had sound reasons to prefer negotiation to litigation, but the issue is not whether EVOX made a good business decision, but whether the parties' negotiations tolled the limitations period.  As in *Adicio*, the negotiations here did not toll the limitations period.

      After 2008, EVOX continued to suspect that Chrome was violating the Agreement.  In 2009, Thompson stated in an internal EVOX email about Chrome, "Settlement payments for underreporting contract. Audit? NADA guides? Bring this to resolution. Collect the money owed before end of 08. . . . Possible Copyright case?"  Giberti Decl., Ex. 18, at E_C 006763. Thompson now asserts that EVOX was concerned only with copyright violations by Chrome's sublicensees, not Chrome's own violations.  But EVOX continued to suspect that Chrome was under-reporting or failing to report fees from sublicensees.  For example, in 2010, EVOX's CEO stated in an internal email, "It's possible chrome has some potentially large exposure to us due to underreporting by sublicensees and/or chrome underpricing for the uses.  We want to be careful before we let them off the hook for this and need to get a quantification of what this is worth." Giberti Decl., Ex. 22, at E_C004870.  EVOX now contends that its internal emails about

Chrome's possible violations of the Agreement actually show "EVOX understood that Chrome did not have a robust capability to audit the use of EVOX's Photographs by Chrome's sublicensees, but also that Chrome intended to work with EVOX to validate any use and compensate EVOX accordingly." Pl.'s Opp'n 25. However, EVOX's willingness to work with Chrome in correcting possible breaches of the Agreement did not toll the limitations period.

I also conclude as a matter of law that EVOX's failure to complete its proposed audit of Chrome shows that EVOX failed to exercise reasonable diligence. If EVOX had conducted the audit, it would have discovered whether Chrome was breaching the Agreement. The California Supreme Court has explained, "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111, 245 Cal. Rptr. 658 (1988); *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983) ("equity will impute to a litigant knowledge of facts that would have been revealed by reasonably required further investigation").

EVOX has several explanations for its failure to complete the Chrome audit. Thompson states that the cost of hiring a third-party auditor "seemed to outweigh the amount EVOX had any reason to expect the audit to reveal" that EVOX was owed, based on prior audits. Thompson Decl. ¶ 28. EVOX also asserts that "Chrome's insistence on using a third-party auditor created a significant financial hurdle for EVOX, as a small, thinly-capitalized private company." Pl.'s Opp'n 4. But the Agreement required that Chrome fully reimburse EVOX for an audit if the audit showed that Chrome had under-reported sales figures by more than 5%. I note that the 2008 audit resulted in EVOX collecting $165,000 from Chrome. Giberti Decl., Ex. 18, at

E_C006761. EVOX states that in the summer of 2012, when it was considering conducting the Chrome audit, "EVOX discovered substantial infringement of its copyrights by some of Chrome's sublicensees." Pl.'s Opp'n 4.

EVOX also argues that Chrome refused to allow the audit by requiring EVOX to employ an independent auditor. But the parties' Agreement provided for third-party audits. In August 2012, Wallace, Chrome's senior product manager, emailed EVOX, stating that the Agreement "does allow for audit rights and if you identify your independent auditor we can get the appropriate paperwork completed to perform the audit. Please don't hesitate to contact me if you have any questions." Giberti Decl., Ex. 33, at E_C005110. There is no evidence that Chrome prevented EVOX from conducting the audit.

EVOX contends that under California law, a party's failure to conduct an authorized audit does not necessarily show a lack of reasonable diligence, citing *Weatherly v. Universal Music Publishing Group*, 125 Cal. App. 4th 913, 23 Cal. Rptr. 3d 157 (Cal. Ct. App. 2004). In *Weatherly*, a songwriter brought an action for breach of contract and other claims against a music publisher, claiming that the publisher had not paid him full royalties due from foreign accounts. The songwriter did not promptly exercise his contractual right to inspect the publisher's records. *Id.* at 918. The trial court granted the publisher's motion for summary judgment, holding that the songwriter's breach of contract claims were barred by a one-year contractual limitations period. The appellate court reversed, holding that the contractual limitations period was tolled because there was evidence that the publisher's royalty statements had been misleading, concealing the alleged breaches of contract. The appellate court stated that "the right to conduct an audit is not dispositive of diligence where there is evidence that the plaintiff was 'hindered' from discovering the breach by the defendant's misrepresentations." 125 Cal. App. 4th at 920 (quoting *El Pollo*

*Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040 (9th Cir. 2003)).

*Weatherly*'s reasoning does not require application of the discovery rule here. EVOX has not presented evidence that Chrome actively hindered EVOX from discovering evidence of misconduct. "A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Wood.*, 705 F.2d at 1521. As evidence of concealment, EVOX contends that Chrome's rate schedules for sublicensees, which Chrome sent to EVOX in 2010 at EVOX's request, "shows Chrome reassuring EVOX that it is charging the correct rates to Gabriels." 2d Tr. 19 (citing Giberti Decl., Ex. 26). In 2012, Thompson forwarded Chrome's rate schedule to Denery, stating, "This will be interesting data for the Chrome Account Review." Giberti Decl., Ex. 26, at E_C005055. Assuming Chrome's conduct could be considered reassurance, a defendant's denials of wrongdoing, without more, do not show fraudulent concealment. *See Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1094 (C.D. Cal. 2016) ("a defendant's failure to 'own up'" to alleged misconduct is not "'*active* concealment'") (quoting *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir. 1996) (emphasis in *Grimmett*)).

Furthermore, even if EVOX could show active concealment by Chrome, EVOX has not shown that it "was, in fact, ignorant of the existence of [its] cause of action." *Wood*, 705 F.2d at 1521; *Grimmett*, 75 F.3d at 514 (doctrine of fraudulent concealment "is invoked only if the plaintiff both pleads and proves that the defendant *actively* misled her, and that she had neither actual nor constructive knowledge *of the facts constituting his[9] cause of action* despite her due diligence") (original emphasis); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (to show fraudulent concealment, the plaintiff must establish that under the circumstances,

---

[9] Perhaps the word "his" should have been "her" in this context.

Page -27- FINDINGS AND RECOMMENDATION

the defendant's "affirmative conduct" would lead a reasonable person to believe he did not have a claim) (citation omitted)).  Evidence of a defendant's misrepresentations is not relevant when the plaintiff has notice of the potential claim.  *See Wolf*, 167 F. Supp. 3d at 1094 (citing *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1409 n.12 (9th Cir. 1995)).  I conclude as a matter of law that EVOX had at least inquiry notice of its potential claims against Chrome by 2012, precluding application of the discovery rule.

In addition, the discovery rule is based on the theory that when "one party has an unfair advantage . . . it would be inequitable to deprive 'an otherwise diligent plaintiff in discovering his cause of action.'"  *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal App. 4th 1249, 1261,157 Cal. Rptr. 3d 467 (Cal. Ct. App. 2013) (citations and further quotation marks omitted).  For example, California courts have applied the discovery rule to a plaintiff bringing an action against her former attorney for breach of fiduciary duty; a real estate purchaser bringing an action against a real estate broker for allegedly failing to disclose construction defects; and home buyers bringing an action against their home inspector for allegedly failing to find serious defects before purchase.  *See id.,*, 216 Cal App. 4th at 1266 n.4 (citing *Weatherly*; *Charnay v. Cobert*, 145 Cal. App. 4th 170, 183, 51 Cal. Rptr. 3d 471 (Cal. Ct. App. 2006); *Wm. L. Lyon & Assocs., Inc. v. Superior Court*, 204 Cal. App. 4th 1294, 1308-09, 139 Cal. Rptr. 3d 670 (Cal. Ct. App. 2012)); *see also Moreno v. Sanchez*, 106 Cal. App. 4th. 1415, 131 Cal. Rptr. 2d 684 (Cal. Ct. App. 2003).  In *Brisbane Lodging*, the court held that an agreement to preclude application of the discovery rule was enforceable because the parties "occupied positions of equal bargaining strength and both parties had the commercial and technical expertise to appreciate fully the ramifications of agreeing to a defined limitations period."  *Id.*, 216 Cal. App. 4th at 1267.  Similarly, here the parties are sophisticated businesses who were dealing with each other at arms-

length throughout their contractual relationship. Under these facts, California courts would not apply the discovery rule to toll the Agreement's limitation period.

EVOX also contends its claims are timely because Thompson's receipt of Gabriels's payment report in January 2014 was EVOX's first notice of Chrome's alleged violations of the Agreement (as well as EVOX's first notice of Chrome's alleged copyright violations). Assuming that the payment report is evidence of Chrome's misconduct (which Chrome denies), the information in the report was apparently known to EVOX in 2010. *See* Def.'s Suppl. Br. 2. Even if EVOX was not aware in 2010 of the information in the payment report, an audit of Chrome sublicenses in 2012 would have disclosed the information, and Thompson then could have determined through public sources whether Chrome was breaching the Agreement. *See* Giberti 2d Suppl. Decl., Ex. 50, at 4 (EVOX stated in *Gabriels* that Thompson researched Gabriels's use of EVOX images through publicly available information online).

Viewed in the light most favorable to EVOX, the evidence shows that well before January 13, 2014, EVOX was either aware of Chrome's alleged misconduct, or should have discovered it using reasonable diligence. Chrome has shown as a matter of law that EVOX's breach of contract claims are barred by the Agreement's two-year limitation period. As discussed below, the same reasoning applies to EVOX's copyright infringement claim.

## II. Copyright Infringement Claim

### A. Elements of Contributory and Vicarious Copyright Infringement

EVOX brings a claim for contributory or vicarious copyright infringement. To prove contributory infringement, the plaintiff must show that the defendant "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007);

*Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). "[M]ere

knowledge of infringing potential or of actual infringing uses would not be enough . . . to  subject

a distributor to liability." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913,

937 (2005). Instead, to be liable, the defendant must take "affirmative steps" to foster

infringement. *Id.* To prove vicarious infringement, the plaintiff must show that the defendant

had "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest

in the infringing activity." *Perfect 10*, 494 F.3d at 802 (footnote omitted); *Luvdarts*, 710 F.3d at

1071.

### B. Should the Two-Year Contractual Limitation Apply to the Copyright Claim?

Before addressing whether EVOX's copyright claim is time-barred, I address whether the

copyright claim "aris[es] out of" the Agreement, requiring application of the two-year contractual

limitation period, rather than the Copyright Act's three-year limitation period. *See* 17 U.S.C. §

507(b) (requiring that copyright claims be "commenced within three years after the claim

accrued"). EVOX does not dispute that parties to a copyright licensing agreement may agree to a

shorter limitation period than the statute's three-year period. *See Order of United Commercial

Travelers v. Wolfe*, 331 U.S. 586, 608 (1947) ("in the absence of a controlling statute to the

contrary, a provision in a contract may validly limit, between the parties, the time for bringing an

action on such contract to a period less than that prescribed in the general statute of limitations,

provided that the shorter period itself shall be a reasonable period").

Chrome argues that EVOX's copyright infringement claim necessarily arises out of the

parties' Agreement because the claim depends on whether Chrome's sublicensees infringed

EVOX's copyrighted images by exceeding the uses permitted by the Agreement. EVOX

responds that "[p]roving contributory copyright infringement requires only that EVOX establish

direct infringement of its works, . . . and then prove that Chrome knew or had reason to know of the infringement, and intentionally induced or materially contributed to that infringing activity." Pl.'s Opp'n 7. Although EVOX concedes that the Agreement may give Chrome an affirmative defense against the copyright infringement claim, EVOX argues that Chrome's affirmative defense is unrelated to any element of EVOX's copyright infringement claim.[10]

Neither party has cited, and I have not found, any decision that specifically addresses whether the contractual limitations period in a copyright licensing agreement supersedes the Copyright Act's limitations period because the infringement claim arises out of the parties' licensing agreement. Chrome instead relies on decisions that apply forum selection clauses in copyright licensing agreements, arguing that a forum selection clause is analogous to a limitation clause because "[b]oth limit the contracting parties' rights to assert claims against one another." Def.'s Reply 3. Chrome cites *Graham Technology Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1433 (N.D. Cal. 1997), where the court enforced a forum selection clause in a licensing agreement because the copyright infringement claim at issue was related to the interpretation of the licensing agreement. *Id.* ("Although the causes of action pleaded in this case by GTSI are copyright infringement claims, resolution of this action ultimately requires interpretation of the [Professional Services Agreement].").

The Ninth Circuit has noted that enforcing a copyright license agreement "raises issues that lie at the intersection of copyright and contract law." *MDY Indus., LLC v. Blizzard Entertainment*, 629 F.3d 928, 939 (9th Cir. 2010). The Ninth Circuit explained that for a

---

[10] EVOX argues, "Perhaps Chrome's affirmative defense would be subject to the two-year contractual limitation period, but EVOX's copyright infringement claims are not dependent on the terms of the Agreement, and the Agreement's limitation period therefore does not apply." Pl.'s Opp'n 8. It is not apparent how this court could apply a different limitation period to an affirmative defense than to the claim itself, and EVOX has not cited authority for doing so.

plaintiff to recover "for copyright infringement based on breach of a license agreement, (1) the copying must exceed the scope of the defendant's license and (2) the copyright owner's complaint must be grounded in an exclusive right of copyright (e.g., unlawful reproduction or distribution)." *Id.* at 940. "Consistent with this approach, we have held that the potential for infringement exists only where the licensee's action (1) exceeds the license's scope (2) in a matter that implicates one of the licensor's exclusive statutory rights." *Id.*

Here, EVOX alleges that Chrome committed copyright infringement by improperly allowing or facilitating current or former sublicensees' access to EVOX's copyrighted images. For example, EVOX alleges that "Chrome made EVOX's Copyrighted Photographs available to additional entities, including but not limited to Beechmont Motors and DealerSocket, Inc. (collectively and with Portratz, the 'Unauthorized Sublicensees') without the contractually requisite authorization from EVOX and/or after such authorization had expired." Compl. ¶ 31. I agree with Chrome that this court could not resolve the merits of EVOX's copyright claim without interpreting the Agreement to determine the scope of the license EVOX granted to Chrome. Because EVOX's copyright infringement claim arises out of the Agreement, I conclude that the Agreement's two-year limitation period applies to EVOX's copyright infringement claim.

### B. Legal Standards for Accrual of Copyright Claims

"A claim ordinarily accrues 'when [a] plaintiff has a complete and present cause of action.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, ___ U.S. ___, 134 S. Ct. 1962, 1969 (2014) (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (further internal quotation marks omitted)). A copyright claim therefore accrues when an infringing act occurs. *Id.* However, a copyright owner may recover "damages

occurring outside of the three-year window, so long as the copyright owner did not discover —

and reasonably could not have discovered — the infringement before the commencement of the

three-year limitation period." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th

Cir. 2004). "Whether a plaintiff's lack of knowledge was reasonable takes into account what a

reasonable copyrightholder in the plaintiff's position would have known." *Garcia*, 2008 WL

4166854, at *6.

### C. Discussion

In 2009, EVOX mentioned that it suspected "possible copyright violations," Giberti

Decl., Ex. 11, at E_C 006763.  Although EVOX now asserts that it did not suspect Chrome itself

of such violations, only Chrome's sublicensees, the record shows that by 2012, EVOX was aware

of possible contributory or vicarious copyright infringement by Chrome.  For example, because

EVOX suspected Gabriels of copyright infringement as of late 2010, EVOX was on inquiry

notice to determine whether Chrome was assisting Gabriels or other sublicensees in infringing

EVOX's copyrighted images.  As Chrome argues, if Chrome's sublicensees Potratz and Gabriels

"were, in fact, infringing, how could they possibly have done so without the assistance of

Chrome?" 2d Tr. 14.   In other words, "the only way Potratz could obtain a photograph post-

licensing, if not from EVOX directly, would be through facilitation by Chrome." 2d Tr. 16.[11]

EVOX relies on Thompson's declaration as evidence that EVOX had no notice of

Chrome's alleged copyright infringement until receiving the Gabriels payment report on January

14, 2014, just within the two-year limitation period.  EVOX contends that until Thompson first

analyzed the Gabriels payment report in 2014, EVOX could not have suspected that Chrome

---

[11] Neither party argues that Chrome's sublicensees "hacked the system" to obtain EVOX's
copyrighted photographs without Chrome's assistance. *See* 2d Tr. 16.

knew of Gabriels's unauthorized use of EVOX copyrighted photographs, and therefore that

Chrome was potentially liable for assisting in Gabriels's alleged copyright infringement. *See* 1st

Tr. 31 (EVOX describing the payment report as "new information that reasonably should have

caused us to believe we had a copyright infringement case against Chrome"). However, as I

conclude above regarding the contract claims, EVOX could have obtained the allegedly crucial

payment report in 2012, if not in 2010 when it first suspected Gabriels of copyright infringement.

Thompson could have conducted the same analysis through publicly available information in

2012 that he conducted in 2014. I conclude that EVOX did not exercise reasonable diligence in

attempting to discover Chrome's alleged copyright infringement.

EVOX also argues that Chrome misled it with assurances that Chrome was not violating

its copyrights. EVOX cites *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108, 1124 (D.

Nev.), *clarified on other grounds*, No. 2:10-cv-00106-LRH-PAL, 2014 WL 5285963 (D. Nev.

Oct. 14, 2014). There, the court stated, "Where a defendant expressly assures competitors that it

is not violating the competitor's intellectual property rights, a plaintiff cannot be charged with

knowledge of the infringing conduct." *Id.* (citing *William A. Graham Co. v. Haughey*, 568 F.3d

425, 439-41 (3d Cir. 2009) (despite "storm warnings" that the defendant was a competitor and

was in possession of copyrighted material, the plaintiff reasonably delayed filing an action

because the defendant had "repeatedly agreed to respect [the plaintiff's] rights to its intellectual

property."). However, even assuming that Chrome gave EVOX the type of express assurances

that were present in *Oracle USA*, EVOX had actual or at least constructive knowledge of

Chrome's alleged violations. As I noted in the breach of contract discussion, evidence of a

defendant's misrepresentations is not relevant when the plaintiff has inquiry notice of the

potential claim. *See Wolf*, 167 F. Supp. 3d at 1094.

Page -34-  FINDINGS AND RECOMMENDATION

Finally, I note that at oral argument, counsel for EVOX contended that "there were infringements by sublicensee Potratz in 2015, of works that were not even created until 2014." 1st Tr. 22. Although Chrome denies EVOX has alleged any copyright infringement occurred within the limitations period, Chrome does not dispute that if any infringement occurred after January 13, 2014, it "would of course be actionable as timely filed." 1st Tr. 34. The Supreme Court has explained accrual for copyright claims:

> It is widely recognized that the separate-accrual rule attends the copyright statute of limitations. Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete "claim" that "accrue[s]" at the time the wrong occurs. In short, each infringing act starts a new limitations period.

*Petrella*, 134 S. Ct. at 1969 (footnotes and citation omitted). Viewing the evidence in the light most favorable to EVOX, I conclude that summary judgment should be denied as to any copyright infringement occurring after January 13, 2014, and otherwise should be granted.

## CONCLUSION

Chrome's Motion for Summary Judgment, ECF No. 77, should be granted as to EVOX's breach of contract claims, and as to EVOX's copyright infringement claim except for conduct occurring after January 13, 2014. Chrome's Requests for Judicial Notice, ECF Nos. 80 and 99, are granted.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings

Page -35-  FINDINGS AND RECOMMENDATION

and Recommendation will go under advisement.


Dated this 6th day of September, 2018.

Honorable Paul Papak
United States Magistrate Judge